UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOUGLAS MILLER,

                 Plaintiff/Counter-Defendant,           No. 03-CV-74954-DT

vs.                                              Hon. Gerald E. Rosen

LANZO HOLDING COMPANY, et al.,

                 Defendants/Counter-Plaintiffs.
_____/

OPINION AND ORDER REGARDING PLAINTIFF'S
MOTIONS FOR SUMMARY/PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____April 29, 2005_____

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

I.  INTRODUCTION

Plaintiff Douglas Miller was formerly employed as the Chief Financial Officer of

Defendant Lanzo Holding Company ("Lanzo").[1]  Plaintiff was hired by Lanzo on January

---

[1]  The other named defendants -- Lanzo Construction Company, Lanzo Construction Company-Florida, Lanzo Lining Company-Michigan, Lanzo Lining Company-Florida, and Moon Roof Corporation of America -- are affiliated businesses of Lanzo Holding Company (Collectively, the companies are referred to herein as the "Lanzo Companies.") Three principals of the Lanzo Companies, Quirino D'Alessandro, Sr., Angelo D'Alessandro and Giuseppe D'Alessandro were also originally named as party-defendants in this matter but by stipulation, the individual defendants were dismissed from this action on October 29, 2004.

1

11, 2000 pursuant to a written employment contract.  On November 27, 2001, Plaintiff's employment was terminated.  Following his termination, Plaintiff made a written request to Lanzo for certain severance and other post-termination payments to which he claimed to be entitled.  Defendants denied Plaintiff's request and this lawsuit ensued.

Discovery has now closed and this matter is presently before the Court on two motions filed by Plaintiff Douglas Miller seeking (1) partial summary judgment as to certain elements of Plaintiff's breach of contract complaint and (2) summary judgment on Defendants' counterclaim for fraud and silent fraud.  Defendants have responded to Plaintiffs' motions to which Response Plaintiff has replied.  Having reviewed and considered the parties' briefs and supporting evidence, and having discussed this matter with counsel on April 21, 2005, the Court has determined that oral argument is not necessary.  Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  FACTUAL BACKGROUND

### A.   LANZO'S HIRING OF DOUGLAS MILLER

The Lanzo Companies are various construction and automotive supply companies owned and operated by the D'Alessandro family.  *See* note 1, *supra*.  The primary family members involved in the day-to-day operations of the business are Quirino D'Alessandro and his sons, Gary, Angelo, Giuseppe and Anthony.  Quirino's daughter, Rose Torres,

and her husband, Paul, also participate in the operations of the businesses.

In 1999, the D'Alessandros knew that the record-keeping and financial systems of the Lanzo Companies were in somewhat of a disarray. Therefore, they began a search to find an executive who could handle the financial needs of their companies. Angelo D'Alessandro retained the Bryant Bureau, a recruiting service, to find qualified candidates for the position of chief financial officer. Defendants' understanding was that the recruiting service performed a background investigation on any applicants. [Angelo D'Alessandro Dep., pp. 8-9, Defendants' Ex. A.] Plaintiff was among the applicants whose names were given to Lanzo. *Id.*

When Plaintiff's name was given to Lanzo, the recruiter, Gregory Lakin, represented to the company that Plaintiff was highly qualified for the position Defendants sought to fill. *Id.* Lanzo was also supplied with a copy of Plaintiff's resume. *Id.* Angelo D'Alessandro admitted, however, that Lanzo did not contact any of the companies listed as former employers on Plaintiff's resume; he believed that the recruiting agency had done so. *Id.*

During his employment interviews, Plaintiff corroborated the representations contained in his resume. Both Quirino and Angelo D'Alessandro testified that during the interviews, they informed Plaintiff of various specific skills and abilities the position would require and Plaintiff told them that he was able to do what the company expected of him. Quirino D'Alessandro testified:

3

Q:     Okay.  What factual statements did he [Plaintiff] make [at the time of his interviews]?

A:     First of all, he said that he was capable of running -- comes from a company that was a family-related, just like ours.  He was able to do every aspect that any company expects him to do regarding financials, payables, receivables, tax returns, and if we had any problems, which we told that we had a little bit of confusion here in Michigan because our controller left.  He says, I will -- I'm a hands-on guy, he says, until I put people in place, I will correct your problem -- I'm able to correct your problem.

* * *

He told us that he could come in and handle banking, handling taxes, handling payables, receivables, put -- he would review the operations and he would put reinforcing strength of his personal skills if he needed to, and he would come in with[in] a timely fashion reports every month and meet with managers, because that's what I asked him if he could do, managers, and then meet with the Board, and definitely he promised me that this was what he would be able to do and what he was capable of doing at that time.

* * *

. . . The reason I hired him, because I was convinced that he -- I mean, convinced that he told me that he was going to be able to do all these things.

[Quirino D'Alessandro Dep., pp. 7, 84-86 Defendants' Ex. D.  *See also*, Angelo

D'Alessandro Dep., pp. 20-23.]     Angelo D'Alessandro testified that in his mind, Miller

distinguished himself from the other seven or eight candidates who were interviewed

because he had previously worked for a large family organization comprised of multiple

4

businesses, which demonstrated that he was a good organizer.  *Id.* at 31-32.[2]

_____

[2] Defendants claim that during the course of discovery in this lawsuit, they discovered that Plaintiff had lied (or deliberately failed to disclose information) on his resume.  Specifically, Defendants point to Plaintiff's deposition testimony regarding having been asked to leave his job with Furst-McNess and his having indicated on his resume that he worked for The Parkview Group from "1991 to present."  The Court notes, however, that there is no indication as to a reason for leaving any of the jobs listed by Plaintiff on his resume.  Furthermore, there is no evidence that Plaintiff was ever asked during his interviews with the company to explain why he left any of the jobs listed on his resume.  Therefore, Plaintiff's having failed to indicate on his resume that he was "asked to leave" Furst-McNess does not constitute a fraudulent misrepresentation or fraudulent concealment.

Similarly, Defendants' reliance upon Plaintiff's testimony that he did not create The Parkview Group until 1996 as evidence that he lied in listing having worked for The Parkview Group from "1991 to present" is misplaced as Plaintiff testified in his deposition that in 1991, he began operating a business out of his home known as Profit Development Consultants, and that small business grew and became "The Parkview Group" in 1996.  The work Plaintiff did while the company was known as The Parkview Group was a continuation of the work he began while the company was known as Profit Development Consultants.  Only the name (and size) of the company changed; Plaintiff's job responsibilities did not.

Furthermore, Defendants acknowledge that the ultimate hiring decision was made by Quirino D'Alessandro and Quirino was very clear when he testified in his deposition that he did <u>not</u> rely on Plaintiff's background or employment history in making the decision to hire him:

> Q:    Okay.  You were relying on Mr. Miller's background and experience in terms of his education and the places he had worked in the past as far as why you hired him; isn't that true?
>
> A:    <u>**No**, I was -- mostly I hired him because I talked to him in person, looked eye to eye, and I told him exactly what I was looking for and he told me that he was the man that I was looking for.</u>

[Quirino D'Alessandro Dep., pp. 93-94.]

A.    <u>PLAINTIFF'S EMPLOYMENT CONTRACT</u>

Lanzo hired Plaintiff as CFO in January 2000.  In connection with Plaintiff's hire,

the parties executed a written employment agreement and a separate "Severance

Agreement."

The Employment Agreement[3] specified that Plaintiff's employment was at-will.

*See* Defendants' Ex. G.  The Agreement also contained various terms regarding

Plaintiff's salary and benefits.  In pertinent part, the Agreement provided as follows:

> <u>During the first twelve months of employment as an at will employee you
> will receive the compensation and benefits as outlined below</u> as long as you
> remain an at will employee.  <u>Thereafter, the policies or benefits referred to
> in this letter</u>, excluding item 8 below [severance], <u>may be amended or
> superseded at the Company's discretion</u> and are solely provided in this
> letter for your understanding at the time of this invitation.

> Key provisions of our offer to you are as follows:

> 1.    Starting salary of $140,000.00 to be adjusted as of 6 months to
>       $160,000.00.

> 2.    Sign on bonus of $10,000.00 gross, payable after 30 days
>       employment.

> 3.    <u>Discretionary bonus; minimum of 25%, up to 100%.  Payable prior
>       to January 30 of the following year.</u>

> 4.    Annual merit salary reviews (January 1st of each year).  Status of
>       exempt.

> 5.    A luxury company car will be provided for you.  Including

---

[3]  The Employment Agreement was in the form of a letter offering employment,
which became a contract upon Plaintiff's signing at the end the letter attesting to his
acceptance of the offer.

6

insurance, maintenance and repairs.

6.     Relocation assistance will be provided for Douglas A. Miller.  As
       part of this relocation, Lanzo Holdings will pay for:

       •     All closing costs, fees and expenses associated with
             the sale of your current residence and the purchase of
             your next residence.
       •     All costs of transporting family and household goods.
       •     All interim commuting and housing costs.
       •     Interim financing if Lanzo wishes to facilitate relocation prior to sale
             of current residence.
       •     Tax gross up allowance on all items includable in your
             Form W-2 that are not deductible on your personal tax
             return.

7.     <u>Participation in a deferred compensation plan to be set up
       immediately upon start of employment.</u>[4]

8.     A severance agreement will be provided prior to start date (structure
       to be agreed upon between Lanzo Holdings and Doug A. Miller)
       allowing for one year compensation and agreed upon relocation
       costs.

_____

[4]  The D'Alessandros had never heard of a "deferred compensation plan," and did
not know what it was.  Plaintiff was given the responsibility to prepare an acceptable plan
that would cover the entire family, as well as Plaintiff.  *See* Angelo D'Alessandro Dep.,
pp. 55-56; Quirino D'Alessandro Dep., pp. 36-37.  Plaintiff eventually provided a version
of a deferred compensation plan to the D'Alessandros but Plaintiff's proposed plan
would only have applied to Plaintiff.  *See* Defendants' Ex. J.  Plaintiff was instructed to
prepare an appropriate plan that would cover everyone, but he never did so.  Quirino
D'Alessandro Dep., pp. 88-89.  Consequently, no deferred compensation plan was ever
executed.

       During the course of discovery, however, Defendants discovered that Plaintiff had
had the D'Alessandros sign checks which were made payable to the order of "Douglas A.
Miller, def. comp." beginning in April 2001 until November 2001 when he was fired
which he did not cash, but kept as "deferred compensation."  *See* Plaintiff's Ex. 6.
Angelo D'Alessandro testified that he signed hundreds of checks at a time and had not
paid attention how they were all made out.

7

9.    Start date of February 1, 2000, or as agreed by both parties.

10.   Participation in all company benefit programs.  Benefits to begin 30 days after start date except for 409K which will start after one year employment.

11.   <u>You will receive 4 weeks of vacation per year</u> until regular company benefits are greater.

* * *

Pleas review and sign the terms of agreement.  This offer is contingent on a favorable written reply (hard copy or fax. . .) by the close of business Tuesday, January 11, 2000.

Defendants' Ex. G (emphasis added).

Miller signed the Agreement in the space provided at the end of the letter and timely returned it to Lanzo.

As indicated, shortly after he executed the Employment Agreement, Plaintiff and Lanzo executed a Severance Agreement.  The Severance Agreement documented agreed-upon severance benefits and provided, in pertinent part, as follows:

This agreement shall commence on the date signed by both parties and shall continue until the end of the payment of severance benefits described herein.  This agreement shall not be amended without the written agreement of both parties.

If Doug's employment is terminated by Lanzo because of any of the following actions taken by Doug, there will be no severance benefits offered to Doug:

1.    Commission of a felony,
2.    Aiding a competitor,
3.    An "employment termination" breach of the Lanzo Holding's "Business Conduct Policy" which is not

8

cured within 15 days of receiving written notice from Lanzo, or

4. Failing the initial drug screen test. This condition shall be deemed permanently waived by Lanzo if not enforced by March 1, 2000.

If Doug's employment is terminated by Lanzo for any other reason or if Doug resigns for "Good Reason," as defined herein, Dough shall receive the following severance benefits:

1. <u>An amount equal to his earnings during the twelve month period</u> (or amounts in the "invitation letter" dated January 11, 2000 if employed for less than one year) <u>prior to the termination</u> or resignation of his employment. This amount shall be paid in equal amounts over twelve months in Lanzo's payroll periods with proper tax withholdings, and

2. If the termination or resignation occurs prior to February 1, 2003, an amount equal to the amount of relocation expenses incurred by Lanzo for Doug's initial relocation to the Detroit area. This shall be paid within sixty days of the termination of Doug's employment as a bonus payment with the required tax withholdings, and

3. Doug shall continue to participate in Lanzo's medical, dental and eyeglass benefit plans during the severance period with any appropriate employee contributions. Thereafter, COBRA or other appropriate continuation coverages shall apply. Doug shall continue to use his company car during the severance period. These benefits shall terminate upon the earlier of the end of the severance period or Doug's obtaining such benefits from his next employment opportunity.

* * *

This agreement will be interpreted under the Laws of the State of Michigan.

Defendants' Ex. H (emphasis added).

B.    <u>PLAINTIFF'S JOB PERFORMANCE PROBLEMS</u>

9

According to the D'Alessandros, within six months of Plaintiff's hire, they began to discover problems with Plaintiff's job performance.  Angelo D'Alessandro testified that he discovered that Plaintiff was unable to prepare the job costing reports that were needed for the day-to-day running of the businesses. [*See* Angelo D'Alessandro Dep., p. 34.] Angelo also observed that under Plaintiff's control, the Lanzo Companies were experiencing cash management problems due to Plaintiff's failure to control accounts payables and receivables.  *Id.* at 37.

After Plaintiff's first six months on the job, Angelo and Quirino D'Alessandro both had meetings with Plaintiff to discuss his performance.  Plaintiff was informed that he had to accomplish the goals initially discussed, which included organizing the Lanzo Companies' corporate structure, addressing delinquent tax issues, and regaining control of the accounts payable and receivable.  Plaintiff assured the D'Alessandros that he could accomplish these tasks.  Angelo D'Alessandro Dep., pp. 40-43.  Despite his problems, Angelo testified that, as an incentive to improve his performance, Plaintiff was given a discretionary bonus.  *Id.* at 50-51, 54.

However, Plaintiff's work did not improve and the company became aware of more and more problems with his performance.  They discovered that Plaintiff failed to file tax returns for the proper amounts and failed to produce accurate financial statements which the company's banks required.  Angelo D'Alessandro Dep., pp. 84-85.  He overpaid the operating engineers union by $300,000 and caused the company to lose

10

more than $300,000 on an account with a vendor that he was directly in charge of plus incurred an addition $100,000 loss due to attorneys fees paid to deal with the problems resulting with that account. *Id.*

Because of these problems, Plaintiff's employment was terminated on November 27, 2001. Plaintiff then demanded Defendants' full compliance with his Employment and Severance Agreements. Defendants did not agree with everything that Plaintiff believed that he was entitled to under the agreements, therefore, Plaintiff initiated this lawsuit. Defendants responded to Plaintiff's Complaint by denying liability and by counterclaiming against Plaintiff for fraud and silent fraud based upon their claim that Plaintiff misrepresented his capability of handling the responsibilities of the CFO job during his pre-employment interviews.

Plaintiff's claims for payment of a 25% bonus, deferred compensation, 12 month's severance pay, and unused vacation days, as well as Defendants' claims of fraud and silent fraud, are now before the Court on Plaintiff's Motions for Summary/Partial Summary Judgment.

## III. <u>DISCUSSION</u>

### A. <u>STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

11

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

---

[5]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).  *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will apply these standards in deciding Plaintiff's Motions for Summary and Partial Summary Judgment in this case.

B.      UNDERLINE BREACH OF CONTRACT ISSUES

At issue in Plaintiff's Motion for Partial Summary Judgment on his breach of contract complaint are Plaintiff's demands that Lanzo (1) pay him a 25% bonus (i.e., $45,000) for 2001; (2) pay him the deferred compensation he claims he is owed pursuant to the terms of the deferred compensation plan he presented to the D'Alessandros (i.e., 20% of his last twelve months salary ($178,333) plus the $45,000 bonus, which amounts to $44,667; and (3) pay him severance pay based upon (a) his $178,333 salary for twelve months preceding his termination, plus (b) a 25% (i.e., $45,000) bonus, plus (c) deferred compensation in the amount of $44,667.[6]  In addition, Plaintiff claims that Lanzo owes

---

[6] Plaintiff claims that additional benefits set forth in his Employment Agreement, including relocation expenses, use of the company car, and continuation of insurance coverage are not ripe for summary judgment, and, hence, are not included in this motion.

13

him for 17 days of unused vacation time, and for four days during which he assisted Defendants' controller who was assigned to take over Plaintiff's job responsibilities after he was fired.  All of these matters require the Court to construe Plaintiff's Employment Agreement and Severance Agreement.

1.      GENERAL PRINCIPLES OF CONTRACT INTERPRETATION

Interpretation of contractual language is a question of law for the court.  *Morley v Automobile Club of Michigan*, 458 Mich. 459, 465; 581 N.W.2d 237 (1998).  It is well-settled in Michigan that, when interpreting a contract, the court must first look to the plain language of the contract.  *See Wilkie v. Auto-Owners Ins Co.*, 469 Mich. 41, 61, 664 N.W.2d 776 (2003).[7]  The goal in the construction or interpretation of any contract is to honor the intent of the parties.  *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, n. 28, 517 N.W.2d 19 (1994); *UAW-GM Human Resource Ctr v. KSL Recreation Corp.*, 228 Mich. App. 486, 491, 579 N.W.2d 411 (1998).  To do so, the court must read the agreement as a whole, *Perry v. Sied*, 461 Mich. 680, 689, 611 N.W.2d 516 (2000), and attempt to apply the plain language of the contract itself. *Michigan Twp. Participating Plan v. Pavolich*, 232 Mich. App. 378, 383, 591 N.W.2d 325 (1998), quoting *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 542-543, 557 N.W.2d 144 (1996); *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996).   The court does not have the right to make a different contract for the parties or to look to extrinsic

---

[7]  The parties do not dispute that Michigan law governs this action.

14

testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning. *UAW-GM Human Resource Ctr v. KSL Recreation Corp*., *supra* (quoting *Sheldon-Seatz, Inc. v. Coles*, 319 Mich. 401, 406-407, 29 N.W.2d 832 (1947), quoting *Michigan Chandelier Co v. Morse*, 297 Mich. 41, 49, 297 N.W. 64 (1941)).

Furthermore, courts are not to create ambiguity where none exists. *Id*. Contractual language must be construed according to its plain and ordinary meaning, and this Court must avoid technical or constrained constructions. *Id*. at 491-492. The fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence of ambiguity in a legal sense. *Steinmetz Elec. Contractors v. International Brotherhood of Electrical Workers*, 517 F. Supp. 428, 432 (E.D. Mich. 1981).

> The real issue is not whether the parties disagree on the meaning of terms to the contract, but whether the terms themselves are ambiguous. If the contract terms are not ambiguous, then contradictory inferences which may be drawn are subjective, and irrelevant.

*Cleveland-Cliffs Iron Co. v. Chicago & N.W. Transportation Co*., 581 F. Supp. 1144, 1149 (W.D. Mich. 1984) (citations omitted).

The Court will apply the foregoing principles in construing the contracts at issue in this case.

2.    UNDER PLAINTIFF'S EMPLOYMENT AGREEMENT, PAYMENT OF AN
      ANNUAL BONUS IS DISCRETIONARY

Plaintiff first claims that under his Employment Agreement, Lanzo is obligated to

pay him a minimum bonus of 25% of his annual salary for the year 2001. As indicated

above, the Employment Agreement provides, in pertinent part:

> During the first twelve months of employment as an at will employee you
> will receive the compensation and benefits as outlined below. . . .
> Thereafter, the policies or benefits referred to in this letter may be amended
> or superseded at the Company's discretion . . . .

> Among the enumerated benefits in the Agreement was the following:

> Discretionary bonus; minimum of 25%, up to 100%. Payable prior to
> January 30 of the following year.

Plaintiff contends that this bonus provision in the Employment Agreement

requires that Defendants pay him a 25% bonus for the year 2001. Plaintiff contends that

because the provision provides for a "minimum" bonus of 25%, the Court should

construe this section as mandating payment to him of at least 25% bonus each year. The

Court finds no merit in Plaintiff's contention. First of all, the very first word in this

provision is "discretionary." Second, the entire benefits section of the Agreement is

prefaced by a paragraph which specifically states that after the first twelve months of

employment, all of the benefits outlined may be "amended or superseded at the

Company's discretion." The fact that the word "minimum" is used does not change the

word "discretionary" to "mandatory"; rather, the plain and ordinary meaning of the word

"minimum" as used in this provision is that if the Company exercises its discretion and

decides to pay Plaintiff a year-end bonus, the amount of that bonus would be a minimum

of 25% of his salary. Here, the Defendants all testified that they were not satisfied with

16

Plaintiff's performance and, although they exercised their discretion and awarded Plaintiff a bonus in 2000 with the hope that the bonus would provide an incentive for Plaintiff to improve his performance, when it did not improve, they elected not to award him any bonus in 2001 and terminated his employment by the year's end.

Therefore, Defendants' refusal to pay Plaintiff a bonus for 2001 was not a breach of the Employment Agreement.

2.      THERE IS NO PROVISION IN THE CONTRACT FOR PAYMENT FOR UNUSED VACATION TIME

Plaintiff's claim for payment for 17 days of unused vacation time is similarly without merit.  Although the Employment Agreement provides for four weeks of vacation per year, there is nothing in the contract which calls for payment for unused vacation time, nor is there anything in the Employee Handbook [Defendants' Ex. M] providing for payment for unused vacation.  Furthermore, Michigan courts have held that unused vacation days are not included in the context of determining "annual compensation."  *See e.g., Gentile v. Detroit*, 139 Mich. App. 608, 619-20 (1984); *Stover v. Retirement Bd. of the City of St. Clair Shores Firemen & Police Pension System*, 78 Mich. pp. 409, 412-13 (1977).  The foregoing makes clear that Plaintiff's claim for payment for unused vacation time has no basis in the contract or in the law.  Therefore, Defendants are not liable for breach of contract based on their refusal to pay Plaintiff for unused vacation time.

17

3.    A MATERIAL ISSUE OF FACT EXISTS WITH REGARD TO PLAINTIFF'S
      CLAIM FOR DEFERRED COMPENSATION

Plaintiff also claims that Defendants breached his employment contract by their

refusal to pay him deferred compensation pursuant to the terms of a Deferred

Compensation Agreement he presented to the D'Alessandros for execution in March

2001.  According to this agreement, Defendants would pay Plaintiff deferred

compensation in an amount equal to "20% of his gross compensation. . . including

salaries, bonuses, commissions and any other form of cash compensation, excluding

benefits under [the Deferred Compensation] Agreement."  *See* Plaintiff's Ex. 5.  Plaintiff

claims that, pursuant to this agreement, Defendants owe him 20% of $178,333 plus

$45,000 (his last twelve months salary plus a 25% bonus), which amounts to $44,667.

First of all, as indicated above, Plaintiff was not entitled to a 25% bonus,

therefore, his calculation as to the amount of deferred compensation is flawed.  More

importantly, however, it is undisputed that the Deferred Compensation Agreement which

Plaintiff presented to the D'Alessandros for execution in March 2001 was never

executed.  The undisputed testimony of the D'Alessandros was that they refused to sign

Plaintiff's proposed Agreement because they wanted him to draw up a plan that would

provide for deferred compensation for the D'Alessandro family members who worked for

Lanzo, as well as Plaintiff.  *See*, *e.g.,*  Angelo D'Alessandro Dep., p. 133; Quirino

D'Alessandro Dep., pp. 36-37.  Plaintiff's proposed plan only provided deferred

compensation for himself.  *Id.  See also*, Plaintiff's Ex. 5.

18

Plaintiff, however, maintains that there was "partial performance" by Defendants as to the payment of deferred compensation to Plaintiff which he claims establishes the existence of a binding contract.[8]  Specifically, Plaintiff claims that beginning in April 2001, Defendants provided him with a weekly check in the amount of $692.30 which was made payable to "Doug Miller -- def. comp." [*See* Plaintiff's Ex. 6.]  It is undisputed that these checks were signed by Defendants' principals.[9]  Plaintiff claims that when he was given these checks he was asked not to cash them for the time being. [*See* Plaintiff's 10/30/04 Affidavit, Plaintiff's Ex. 4.][10] He claims that he accepted this arrangement and relied upon Defendants' promises that Defendants would live up to the agreement.  *Id.*

The D'Alessandros, however, all categorically deny ever giving Plaintiff the checks and asking him to not cash them.  *See* Angelo D'Alessandro Dep., p. 63; Giuseppe D'Alessandro Dep., p. 20; Quirino D'Alessandro Dep., p. 37-38.  Furthermore, although the D'Alessandros admitted that the signatures on the checks were theirs, they

---

[8]  Partial performance may in certain circumstances constitute acceptance of a contract.  *See, Opdyke Inv. Co. v. Norris Grain Co*., 413 Mich. 354, 362-63, 320 N.W.2d 836, 839 (1982), citing 1 Corbin, Contracts, § 88, p. 375; *see also Cattin v. General Motors Corp*, 955 F2d 416, 430-31 (6th Cir. 1992)

[9]  Some of the checks were signed by Angelo D'Alessandro, some were signed by Quirino D'Alessandro, some were signed by Giuseppe D'Alessandro, and one check was signed by Rose Torres.

[10]  From the evidence produced, the Court cannot determine whether Plaintiff was ever questioned about the checks at his deposition, as Defendants only have produced a small portion of the transcript of Plaintiff's deposition and the excerpts provided do not address this issue.

19

denied knowing at the time that the checks were signed that they were deferred

compensation for Plaintiff.  Angelo D'Alessandro testified that he signed hundreds of

checks at a time and he did not pay attention to how each was made out.  *See* Angelo

D'Alessandro Dep., pp. 135-138.  Quirino D'Alessandro testified that when a check was

for a relatively small sum was put before him for signature, he just assumed that it was

for "reimbursement for pocket money" and when he had "no reason to scrutinize and

challenge someone's integrity," he simply signed the check.  *See* Quirino D'Alessandro

Dep. p. 35.

Giuseppe D'Alessandro testified that, although he had not paid attention to how

the checks were made out at the time they were signed, he discovered that they were for

Plaintiff's "deferred compensation" shortly before Plaintiff was terminated:

Q:     Do you have a memory of actually signing these checks?

A:     Yeah.

Q:     All right. . . .  Did you have some understanding at the time what these
       checks were payable for?

A:     No.

Q:     All right.  Who presented you with these checks for your signature?

A:     They were presented by our staff accountant or controller, whatever
       you want to call her, in Florida, Marielle Rodriguez.

Q:     So you were in Florida when you signed these checks?

A:     Uh-huh. . . . . Yes.

* * *

Q:    Okay.  Before Mr. Miller was terminated, did anybody ever tell you
      what these checks were for that you were signing?

A:    Shortly before, yeah.

Q:    Okay. . . .  Who told you?

A:    I had to ask.

Q:    Who did you ask?

A:    I think I had asked Marielle, what is this, the first time I seen a big
      balance on our accounts payable for [Lanzo] holding company.

* * *

Q:    Okay.  So what did she tell you when you asked her?

A:    Well, she had told me . . . that Doug had told her that goes on the
      payable and these checks get written. . . .

      After that when I called him he said this is for my deferred comp.

* * *

Q:    Okay.  So he told you it was my deferred compensation, did you
      have any reply to that?

A:    I said, well, how did you come up with a deferred compensation
      deduction when we haven't even developed the plan or determined
      how much it could be or any of that, did you just pick it all by
      yourself?

Q:    And what did he say?

A:    He said, yeah, well, it's kind of the parameters that we talked about.
      I said, I don't know who you talked about it with because I don't
      remember determining what percentage of the deferred comp you

21

would be getting or anything.

Q:    And what's your best estimate of when you had that conversation with him?

A:    Shortly before he got terminated.

* * *

Q:    . . . So, . . . would you have talked with any of your family members to find out why it was -- that Doug Miller was getting deferred compensation checks?

A:    Yes. . . .  I talked to my brother [Angelo] about it. . . .   He wasn't aware of it, he didn't remember anything about it.

* * *

I talked to my father about it. . . .   He didn't know anything about it either.

* * *

Q;    Okay.  So once you made this discovery about Miller getting these deferred compensation checks, did anybody at Lanzo make any attempt to either stop payment on them or tell him that this was not going to work, you know, that there would be no such deferred compensation, there was no such agreement?

A:    Well, I think I might have mentioned something to him, the fact that it doesn't matter that you get these checks because you know as well as I do that we never agreed to a plan.  It's something that's got to be set up government foolproof by an outside firm, you were supposed to engage a firm to develop one to present to us so we could see whether we wanted to do something of this nature -- and you can't just start making a check for yourself and assume that's called deferred comp, because it's got to be done to set up the proper way and you were supposed to be the guy to get something in front of us to approve.

* * *

Q:     Did anyone at Lanzo ask him to return the money?

A:     He had told me that he never cashed any of the checks.

Q:     Did he tell you why?

A:     He never told me why.  He said I'm just holding them right now.

Q:     Did anyone at Lanzo ask him to hold the checks and not cash them?

A:     Not that I'm aware of.

Q:     Okay.   Was he ever asked to return the checks even though he hadn't cashed them?

A:     He might have been but at that point it wasn't important to me because I knew there was no money in the account to cash them against, it wouldn't have mattered.

Q:     Okay.  Was any attempt made to stop payment at any other time such as maybe after he was terminated?

A:     I may have instructed someone to make sure that none of these checks can be cashed or stop payments on them.  I might have -- I can't recall.

[Giuseppe D'Alessandro Dep., Defendant's Ex. B, pp.14-20.]

Given the foregoing contradictory testimony of the parties with regard to issuance of deferred compensation checks, a material issue of fact exists as to whether the checks may be used to establish Defendants' acceptance of Plaintiff's proposed deferred compensation agreement.  Therefore, summary judgment on this issue is not appropriate.

This same issue of fact also precludes summary judgment as to the amount of

severance pay to which Plaintiff is entitled.

In sum, Plaintiff is not entitled to a $45,000 bonus, nor is he entitled to payment for unused vacation time.  Further, issues of fact preclude summary judgment with respect to Plaintiff's claims for deferred compensation and severance pay.  For all of these reasons, Plaintiff's motion for partial summary judgment on his breach of contract claim will be denied.

## C.   DEFENDANTS' COUNTERCLAIM FOR FRAUD AND SILENT FRAUD IS WITHOUT LEGAL MERIT

Plaintiff's second motion for summary judgment addresses Defendants' counterclaims for fraud.  As indicated above, Defendants' fraud claims are predicated upon their contention that Plaintiff misrepresented in his pre-employment interviews that he was able to perform the duties of the position of Chief Financial Officer.

To establish a claim for fraud under Michigan law requires proof by clear and convincing evidence of all of the following elements: (1) the defendant made a material representation; (2) that it was false; (3) that when the representation was made the defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intent that it should be acted upon by the plaintiff; (5) that the plaintiff acted in reliance; and (6) that plaintiff suffered injury. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 247 N.W.2d 813, 816 (1976).  However, it is axiomatic that an action for fraud is limited to statements of existing facts, not future promises, and not opinions.  In *Hi-Way Motor Co.*, the Michigan

24

Supreme Court emphasized that "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or existing fact.  Future promises are contractual and do not constitute fraud."  *Id.  See also, Michigan National Bank of Detroit v. Holland-Dozier-Holland Sound Studios*, 73 Mich. App. 12, 18, 250 N.W.2d 532, 535 (1976) (holding that the failure to carry out a promise to perform a future act does not constitute actionable fraud and that the remedy is an action for breach of contract.)

A promise to do something in the future is not a misrepresentation of material existing fact even when the promise is not kept.  *See Broaden v. Doncea*, 340 Mich. 564, 66 N.W.2d 216  (1954).  The *Broaden* court explained:

> Since a fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise, or an agreement to do something at a future time, or to make good subsequent conditions which have been assured. . . . Reasons given for this rule are that a mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made. The failure to make it good is merely a breach of contract, which must be enforced by an action on the contract, if at all.

340 Mich. at 571-72, 66 N.W.2d at 220.

The record evidence in this case establishes that, at best, what Defendants are referring to as false representations are nothing more than promises made by Plaintiff to perform well in the future.  As the above quoted Michigan authorities make clear, such

assertions cannot, as a matter of law, support an action for fraud.

CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment on his breach of contract claim is DENIED.[11]

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim is GRANTED. Accordingly, Defendants' Counterclaim is hereby DISMISSED, with prejudice.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: April 29, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 29, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

---

[11] The Court has found that issues of fact exist which preclude summary judgment on Plaintiff's claims for deferred compensation and severance pay. Further, as indicated above in this Opinion and Order, the Court is also denying summary judgment on Plaintiff's claims for payment of a bonus and for unused vacation time because it has determined that Plaintiff's claims for payment of a bonus in 2001 and for his unused vacation time are without merit. The Court notes that Defendants have not cross-moved for summary judgment. Because the Court has effectively decided that Defendants would be entitled to such relief, upon the presentation of a proper motion, the Court will enter partial summary judgment in Defendants' favor on these two issues.